Nellya NISENZON et al.

v.

Arthur SADOWSKI et al.

No. 94–263–Appeal.

Supreme Court of Rhode Island.

Feb. 20, 1997.

Peter Olsen, Wickford, for Plaintiff.

Lauren Jones, Providence, Gerard M. De-Celles, Smithfield and Stephen A. Gordon, Providence, for Defendant.

## OPINION

FLANDERS, Justice.

We begin with the moral of this story: lawyers who help to separate insolvent debtors from their assets by acquiring those assets for inadequate consideration soon become debtors themselves.

### I

### Parties

The defendants, Park City Capital (Park City), a Rhode Island general partnership, and James D. Levitt (Levitt), a Rhode Island attorney and one of Park City's general partners, appeal from a $30,000 judgment entered against them by the Superior Court in favor of plaintiffs, Nellya and Iosif Nisenzon (the Nisenzons). After a jury-waived trial, a Superior Court justice found Levitt liable for common-law fraud and Levitt and Park City liable for fraudulently transferring a certain parcel of real estate that was half owned by the Nisenzons. Although unnamed as parties and unserved as defendants, Levitt's other Park City partners, Leo J. Gannon, John J. Ridlon, Fred S. Hashway, Jr., and Stephen A. Gordon (collectively the unnamed Park City partners), also appeal from the judgment below, claiming they were improperly added to the judgment after the trial had concluded.

For the reasons set forth below, we affirm the judgment in all respects except one: we vacate any portion of the judgment that includes the unnamed Park City partners in their individual capacities.

### II

### Facts and Travel of the Case

On January 5, 1987, the Nisenzons gave Arthur Sadowski (Sadowski) $20,000 to become a co-owner with him of a waterfront lot on Gordon Avenue in Warwick, Rhode Island (the property).[1] Sadowski solicited this in-

---

1. Although named as a defendant, Sadowski is not a party to this appeal because he filed for

vestment from Iosif Nisenzon (Nisenzon) and prepared a document on January 5, 1987, for Nisenzon to sign that read:

> "This letter that I Arthur Sadowski am buying lot 377 on Gordon Ave.[,] Warwick, R.I. with Iosif Nisenzon. Iosif will pay $20,000.00 twenty thousand dollars for his share. All profit will be 50% for Iosif and 50% for Arthur Sadowski on whatever we do."

Although both Sadowski and Nisenzon signed this document, Nisenzon did so without knowing that Sadowski had already purchased the property in his own name on December 31, 1986. Levitt, Sadowski's real estate attorney, notarized Sadowski's quitclaim deed to the property. Neither Sadowski nor Levitt ever amended this deed to reflect the Nisenzons' co-ownership interest, nor did they record the January 5, 1987 document showing the Nisenzons' interest in the property in Warwick's land evidence records.

Approximately one year later, on January 10, 1988, Sadowski requested more money from the Nisenzons—this time a $10,000 loan. In response the Nisenzons borrowed $10,000 and lent it to Sadowski at 20 percent interest with the understanding that the loan was to be repaid in one year.[2]

Notwithstanding Sadowski's representations to the Nisenzons that the property's value had increased, by the summer of 1988 the Nisenzons had become sufficiently concerned about their money that Iosif informed Sadowski that they were considering consulting an attorney. But Sadowski convinced him to desist by telling him that doing so would only complicate matters. In fact Sadowski had other plans for the property.

On September 27, 1988, Sadowski conveyed the property to his attorney, Levitt, without having informed the Nisenzons that he would be doing so. Levitt, whose legal practice had been concentrated in real estate for over twenty years, acquired the property via a quitclaim deed that stated that "the consideration is such that no revenue stamps need be affixed." At trial, Levitt testified that the consideration for this transfer was a $17,000 loan that he made to Sadowski and that he was merely holding the property to secure this loan.[3] However, no written documentation or other written evidence of the loan or any other alleged consideration for the property's transfer to Levitt was ever offered at trial or produced through discovery—despite discovery requests from the Nisenzons to defendants to produce such documentation if it existed.

Eventually, in January or February of 1989, the Nisenzons' concerns about what Sadowski had done with their money led them to consult John DeVito (DeVito), a Massachusetts attorney. On March 9, 1989, DeVito sent a letter to Levitt in which he described the Nisenzons' interests in the property (identified as "Lot 377 on Gordon Avenue, Warwick, Rhode Island"), referenced Sadowski's additional $10,000 debt to the Nisenzons, and expressed an interest in obtaining security for the money owed to them.

Shortly thereafter, on May 1, 1989, Hugh E. Barry (Barry), an attorney associated with Levitt's law firm, prepared a reply to DeVito's letter on behalf of the firm of Gordon & Levitt. The letter reflected that it was "READ AND ASSENTED TO" by the firm's client, Sadowski, who also signed it.[4]

---

bankruptcy just before the trial began. The trial justice stated that Sadowski's bankruptcy stayed this action against him, but the court nonetheless entered a judgment against "Arthur Sadowski et als."

**2.** In return for the loan Sadowski gave the Nisenzons a note, signed by both the Nisenzons and Sadowski, which read, "Received $10,000.00 ten thousand dollars from Iosif and Nellya Nisenzon to be paid back at (20%) twenty percent interest one year from this date 1–10–88[,] January 10, 1988."

**3.** But when he was asked to state the reason Sadowski had conveyed his interest in the property to him, Levitt stated in his answers to interrogatories that "[i]t was a sale" and that he had paid $39,500 for the property. Sadowski, too, in his answers to interrogatories, stated that he had received $39,500 as consideration for conveying the property.

**4.** Barry's letter read as follows:
"Pursuant to our recent conversation, I have discussed this matter with Mr. Sadowski. His position is as follows: (1) He acknowledges the debt of $30,000.00 owed to Joseph and Nellya

In a June 15, 1989 reply to this letter, DeVito told Barry that "[i]t was some assurance to my clients to have Mr. Sadowski acknowledge the debt." He further stated that the Nisenzons were willing to delay receiving any payment until October but that they requested a realistic payment plan in writing and executed by Sadowski. DeVito also stated that "[i]n fairness" Sadowski should agree to pay interest on the moneys advanced to him by the Nisenzons, and he requested that Barry discuss the contents of the letter with Sadowski.

Meanwhile, notwithstanding his knowledge of the Nisenzons' claims against Sadowski and of their interest in the property, Levitt conveyed the property to his Park City partnership on August 1, 1989. The deed once again reflected that the consideration was such that no revenue stamps need be affixed. Unbeknownst to the Nisenzons, that same day Park City also granted a mortgage on the property to Omega Financial Corporation (Omega) to secure the repayment of a $150,000 loan. The trial justice refused to allow Levitt to testify in regard to the alleged consideration for these transfers because of the very limited response he had given (only the deeds were provided) to the Nisenzons' discovery requests regarding these transactions.[5]

On September 25, 1989, DeVito wrote a letter to Levitt, stating that he had held off on filing suit in reliance on the payment assurances DeVito had received from Levitt's law firm as set forth in Barry's May 1 letter but that he had heard nothing from Levitt or his firm since having received that letter. He requested that Levitt contact him concerning the promised repayment of Sadowski's debt. On January 17, 1990, Levitt wrote DeVito about Sadowski's financial situation and his inability to repay the Nisenzons before some of his other creditors. Once again Levitt made no mention of his interest in the property.

After receiving this letter, DeVito immediately wrote to Levitt, requesting that Sadowski give a mortgage to the Nisenzons on the property or consent to a $30,000 judgment, in the absence of either of which, he stated, the Nisenzons would institute legal action. When Levitt failed to comply with this request, the Nisenzons obtained Rhode Island counsel to conduct a title search on the property. As a result of the title search, the Nisenzons learned for the first time that the property had been transferred to Levitt and then to Park City, and that it was then further encumbered by two mortgages—the first from Park City to Omega in August 1989 and the second, granted on April 30, 1990, from Park City to Chariho–Exeter Credit Union (Chariho) to secure the repayment of a $165,000 loan. In conjunction with the Chariho mortgage application, Park City placed a value on the property of $90,000. Levitt agreed with this valuation. DeVito testified that if he had been aware in March 1989 that Sadowski was not going to pay the money he owed to the Nisenzons, he would have recommended the immediate filing of a notice of lis pendens and the initiation of suit.

In December 1990, the Nisenzons filed suit against Sadowski, Levitt, and Park City. They sued Levitt both individually and in his capacity as general partner of Park City. At the trial in January 1994, the Nisenzons'

Nisenzon; (2) He agrees to pay them back the $30,000.00; (3) He is not financially able to pay any interest on the loan; (4) He cannot provide any security for his promise to pay back your clients.

"In his effort to avoid financial insolvency, Mr. Sadowski has embarked upon a ridged-debt-payoff [*sic*] schedule. By October of 1989, he will have satisfied approximately eighty, (80%) percent of these obligations. Coupled with his new present employment as a real estate broker, Mr. Sadowski expects to be financially stable enough to structure a realistic payment plan at that time.

"Although this arrangement may be less than satisfactory to your clients, it should be understood that Mr. Sadowski, last year, chose not to declare insolvency; rather he struggled to begin paying off his obligations on a slow, steady and realistic basis. He regrets that he cannot pay back Mr. and Mrs. Nisenzon sooner, and asks that they remain patient for several more months. To promise payment that he cannot follow through on would serve little purpose."

5. Levitt claimed in his answers to interrogatories that he "held the Deeds only as collateral for funds advanced by me to Arthur Sadowski. Park City actually acquired the property from Arthur Sadowski; I just effected the conveyance."

witnesses were Iosif Nisenzon and DeVito; defendants' sole witness was Levitt. The trial justice found Levitt's testimony to be incredible. In particular he did not believe Levitt's assertion that he was unaware of the Nisenzons' interest in the property until March 1989.[6] The trial justice further determined that the Nisenzons had proven their common-law-fraud claim against Levitt and that they had also established their fraudulent-transfer claims against both Levitt and Park City. He then awarded the Nisenzons damages against these defendants in the amount of $30,000 and requested that an "appropriate judgment" be prepared.

The judgment prepared and proposed by the Nisenzons, however, provided that a judgment would enter not only against Levitt and Park City, as set forth in the trial justice's decision, but also against the unnamed Park City partners. Levitt and Park City objected, arguing that since none of the unnamed Park City partners had been included as defendants in the case or served with process, the court had no basis to enter judgment against them individually. After a hearing, the trial justice rebuffed the objection and denied defendants' request to exclude the unnamed Park City partners from the judgment. But instead of entering the judgment presented by the Nisenzons, on March 25, 1994, the court entered its own form of judgment against "Arthur Sadowski et als."

On appeal defendants claim that the Superior Court erred in finding that Levitt had committed common-law fraud. They argue that the Nisenzons made no such claim against him and that, even if they had, there was insufficient evidence to support this cause of action. The defendants also assert that there was insufficient evidence to prove any fraudulent transfers. The unnamed Park City partners argue that to the extent the judgment includes them in their individual capacities, it should be vacated because they were neither named nor served with process in the action below and thus had no opportunity to appear and defend. The Nisenzons respond by arguing that sufficient evidence exists to support the Superior Court's findings of common-law fraud and fraudulent transfers. They further contend that service of process upon Levitt, as general partner of Park City, provided sufficient notice to the unnamed Park City partners and that, therefore, the judgment should be affirmed as against each of them in their individual capacities.

## III

### Analysis

#### A. Standard of Review

We give substantial deference to the factual findings, inferences, and conclusions of a trial justice sitting without a jury, reversing only if "he or she overlooked or misconceived material evidence or was otherwise clearly wrong." *Wickes Asset Management, Inc. v. Dupuis,* 679 A.2d 314, 317 (R.I.1996). Moreover, and of particular significance here, as a front-row spectator the trial justice has the chance to observe the witnesses as they testify and is therefore in a "better position to weigh the evidence and to pass upon the credibility of the witnesses than is this court." *Lembo v. Lembo,* 677 A.2d 414, 417 (R.I.1996). Consequently we shall "allow the findings of fact made by the trial justice to remain undisturbed on review unless it can be shown that he or she was clearly wrong." *Id.* Finally, "[i]f, on review, the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for his [or hers] even though a contrary conclusion could have been reached." *Tim Hennigan Co. v. Anthony A. Nunes, Inc.,* 437 A.2d 1355, 1357 (R.I.1981).

#### B. Fraudulent Conveyance Claim

Levitt argues that the Nisenzons "simply failed" to prove a fraudulent transfer and that the trial justice misconceived the dearth of evidence supporting his findings that the conveyances from Sadowski to Levitt and from Levitt to Park City were fraudulent. Specifically, Levitt claims that there was no

---

**6.** The Superior Court justice found that it is "clear that Levitt was aware of plaintiff's interest when these actions [the transfers and the granting of the mortgages] were schemed."

evidence that Sadowski was insolvent at the time of his transfer of the property to Levitt or that Sadowski was rendered insolvent by that transfer. Moreover, Levitt claims that the evidence was insufficient to support a finding of inadequate consideration for the transfer from Sadowski to Levitt and that, therefore, the Nisenzons failed to prove their fraudulent-conveyance claims. The Nisenzons respond by arguing that the trial justice's findings were amply supported by the evidence and by his assessment of the witnesses' credibility.

In pertinent part the Uniform Fraudulent Transfer Act, G.L.1956 § 6–16–5(a), as adopted in Rhode Island, provides as follows:

"A transfer made * * * by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made * * * if the debtor made the transfer * * * without receiving a reasonably equivalent value in exchange for the transfer * * * and the debtor was insolvent at that time, or the debtor became insolvent as a result of the transfer * * *."

See, e.g., Rhode Island Depositors' Economic Protection Corp. v. Mollicone, 677 A.2d 1337, 1339 (R.I.1996) ("[u]nder the act a conveyance is fraudulent in regard to creditors, without regard to the transferor's actual intent, if the conveyance was made without fair consideration and the debtor was either insolvent at that time or was thereby rendered insolvent"). Here, there were two transfers [7] that the Superior Court justice found to be fraudulent: the initial transfer of the property from Sadowski to Levitt in September 1988 and the later transfer from Levitt to Park City in August 1989. We consider each in turn.

## 1. The Transfer from Sadowski to Levitt

There are two issues concerning the September 1988 transfer of the property from Sadowski to Levitt: (1) whether Sadowski received reasonably equivalent value [8] for the transfer and (2) whether he was insolvent [9] at the time of the transfer or became insolvent as a result of the transfer.

■ The trial justice noted that the transfer deed recited that the consideration was such that no revenue stamps need be affixed. See Halpern v. Pick, 522 A.2d 197, 198 (R.I. 1987) (the lack of revenue stamps on a deed does not conclusively indicate the absence of consideration, but it may be considered by the trier of fact with all the other evidence concerning the nature of the transaction). He then found that Levitt's testimony concerning the consideration he allegedly gave to Sadowski for the transfer (a purported undocumented $17,000 loan) was unbelievable. Levitt also testified that Park City appraised the property at $90,000 before it submitted a mortgage application to Chariho in April 1990. Finally, the trial justice considered the fact that after the transfer from Sadowski to Levitt and from Levitt to Park City, two mortgages were granted on the property amounting to $315,000. Relying on this evidence, the lack of revenue stamps and any documentation to support the alleged consideration, and his negative assessment of Levitt's credibility, the trial justice concluded that the transfer was made without Sadowski's receiving reasonably equivalent value in exchange for the property. This finding does not appear to us to be clearly erroneous, especially given the evidentiary contradictions concerning exactly what consider-

7. " 'Transfer' means every mode * * * of disposing of or parting with an asset or an interest in an asset, and includes payment of money * * * and creation of a lien or other encumbrance." G.L.1956 § 6–16–1(*l*); see also § 6–16–6(a)(1) ("[a] transfer is made * * * when the transfer is so far perfected that a good faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee").

8. "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation,

property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." Section 6–16–3(a).

9. "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation. * * * A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent." Section 6–16–2(a), (b).

ation, if any, passed from Levitt to Sadowski upon the transfer of this property.

■ The trial justice also concluded that Sadowski was or became insolvent as a result of the September 1988 transfer to Levitt. In so concluding, the trial justice looked to the May 1, 1989 letter from Barry to DeVito. That letter represented that Sadowski "is not financially able to pay any interest on the loan," that he could not provide any security for his promise to pay back the loan, and that he "chose not to declare insolvency" in 1988. By this last representation, Levitt's firm was indicating to the Nisenzons' lawyer that Sadowski was in fact insolvent in 1988. Moreover, the letter also reflects that in 1988 Sadowski was not paying his debts as they became due, thereby giving rise to a presumption of insolvency pursuant to § 6–16–2(b). We cannot say the trial justice committed reversible error when he inferred from this evidence that Sadowski was already insolvent or became insolvent when he transferred the property to Levitt on September 27, 1988.

■ For these reasons, we do not believe that the trial justice was clearly erroneous in his finding that the transfer of the property from Sadowski to Levitt was fraudulent. The trial justice then had to fashion a remedy. Sections 6–16–7(a)(1) and 6–16–7(a)(3) provide that, subject to specified limitations, a creditor may obtain avoidance of the transfer to the extent necessary to satisfy the creditor's claim or, subject to principles of equity, may be awarded any other relief that the circumstances may require. Section 6–16–8(b) provides that

> "to the extent a transfer is voidable in an action by a creditor under § 6–16–7(a)(1), the creditor may recover judgment for the value of the asset transferred * * * or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:
>
> "(1) The first transferee of the asset or the person for whose benefit the transfer was made; or
>
> "(2) Any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee."

Moreover, "a money judgment may enter pursuant to a complaint for fraudulent conveyance as against a transferee, where such transferee has disposed of or dealt with property wrongfully conveyed in such fashion that a return of the property is impossible * * *." *Spaziano v. Spaziano,* 122 R.I. 518, 521, 410 A.2d 113, 115 (1980).

■ Levitt, the first transferee of the property, argues that the extent of a transferee's liability for a transferor's fraudulent transfer was left open in *Spaziano* and that in this case there was "no evidence of the value of the property when conveyed. Therefore, the imposition of money damages as a result of the transfer was unsupported by any evidence." Although Levitt is correct that there was no direct testimony regarding the value of the property in September 1988 when it was fraudulently conveyed to him, it appears that the trial justice fixed the damages award against Levitt and Park City by the amount of the Nisenzons' claim against Sadowski rather than by the value of the property when it was transferred. *See* § 6–16–8; *see also Spaziano,* 122 R.I. at 522, 410 A.2d at 115 (" 'equity will not allow itself to be frustrated but will adapt its relief to the exigencies of the case and will enter a money judgment if this will achieve an equitable result' ").

Here, the trial justice imposed a money judgment upon Levitt and Park City in the amount of the money given by the Nisenzons to Sadowski. Most of this money was supposed to have been invested in the property that was then fraudulently transferred by Sadowski to Levitt and then by Levitt to Park City. The defendants knew of the Nisenzons' claim to the property. They also knew that because of Sadowski's parlous financial condition, any transfer of the property from Sadowski to others would at least hinder or delay creditors like the Nisenzons, if not frustrate them altogether, in their attempt to obtain repayment from him. We therefore cannot say this result was clearly erroneous or inequitable in the circumstances of this case.

### 2. The Transfer from Levitt to Park City

■ The defendants argue that "[s]ince the transaction to Levitt was not fraudulent,

it follows that the subsequent transfer to Park City * * * and encumbrances by mortgage were likewise not fraudulent." They claim error in the trial justice's conclusion that Levitt's transfer to Park City was fraudulent even though it occurred five months after Levitt became aware that the Nisenzons "*had* an interest" in the property. They argue that this finding assumes that Levitt acknowledged and agreed that the Nisenzons had a continuing interest in the property itself rather than just a claim[10] against Sadowski.

However, we conclude that the trial justice was correct in finding that this transfer was fraudulent. Pursuant to § 6–16–4(a)(1), "[a] transfer made * * * by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made * * * if the debtor made the transfer * * * [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." *See also Warwick Municipal Employees Credit Union v. Higham*, 106 R.I. 363, 368–69, 259 A.2d 852, 855 (1969) ("the decisive question * * * with regard to fraudulent intent is * * * whether * * * a conveyance had the effect of depriving plaintiff of a right which would have been legally effective had the conveyance not been made").

Here, because of his status as the first transferee in the property's initial fraudulent transfer, Levitt was a debtor vis-à-vis the Nisenzons when he transferred the property to Park City and encumbered it with mortgages. The trial justice found Levitt's testimony that "he was not aware of plaintiff's interest in the property until March of 1989 * * * [to be] unsupported" and determined it to be "clear that Levitt was aware of plaintiff's interest [in the property] when these actions [the transfers and the granting of mortgages] were schemed." Affording this credibility and factual determination the deference it is due, we conclude that the trial justice was not clearly wrong in finding that Levitt acquired the property for inadequate

consideration in the initial transfer from Sadowski when he was insolvent or became insolvent in connection with the transfer. Pursuant to 6–16–8(b), a money judgment may enter against such a transferee. Thus, the Nisenzons had a claim against Levitt from the time of Sadowski's initial transfer of the property to him in September 1988.

Moreover, as noted by the trial justice, even if Levitt had not been aware of the Nisenzons' claims until March 1989, he still transferred the property to Park City in August 1989 when he was concededly aware of their claims and of Sadowski's dire financial straits. Notwithstanding this knowledge, he then proceeded to encumber the property with mortgages that were more than three times his own valuation of the property's worth. For these reasons the trial justice was not clearly wrong in concluding that the Levitt-to–Park–City transfer was fraudulent because the evidence supports the conclusion that when Levitt transferred the property to Park City he was acting with actual intent to hinder, to delay, or to defraud the Nisenzons in their effort to collect the money that was owed to them.

### C. Fraud

Levitt also argues that the Nisenzons alleged no common-law-fraud claim against him and that, even if they did, he made no false statement, nor did he have a duty to disclose to them his interest in the property. The Nisenzons counter that the evidence fully supports the finding of common-law fraud and that it is precisely because of Levitt's interest in the property that he had a duty not to participate actively in the fraudulent conduct of his client, Sadowski.

■ Even though the Nisenzons' complaint does not contain a specific claim captioned "common law fraud," it does contain the factual allegations that raise all the issues concerning whether defendants' conduct was fraudulent.[11] Moreover, even "[w]hen

10. " 'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Section 6–16–1(c).

11. Common-law fraud consists of a false or misleading statement of material fact that was known by the defendant to be false and was made with intent to deceive, upon which the plaintiff justifiably relies to its detriment. *See Fournier v. Fournier*, 479 A.2d 708, 714 (R.I.

issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Super.R.Civ.P. 15(b); *see also* Super.R.Civ.P. 54(c) ("every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled even if the party has not demanded such relief in the party's pleadings"). The trial justice noted in his decision that "[t]he action against Levitt and Park City Capital came before this court for a trial without a jury * * *. Plaintiff sought equitable relief against both Levitt and Park City Capital. * * * [P]laintiff alleged that Levitt committed fraud by obtaining an interest in the property without disclosing to plaintiff his financial interest in said property." We believe that the trial justice correctly concluded that the common-law-fraud claim was actually tried to the court without any objection from defendants. Therefore, such a claim will be treated as if the pleadings had been amended to include it.

■ Levitt's status as an attorney for the debtor Sadowski does not insulate him from liability for engaging in fraud. An attorney owes a duty to an adverse party not to participate actively in fraudulent conduct.[12] The trial justice found that the May 1, 1989 letter from Levitt's firm to DeVito contained false representations regarding Sadowski's ability, willingness, and intent to repay the Nisenzons. The letter was written at a time when Levitt had already acquired the property, yet not only did it fail to disclose Levitt's ownership, it affirmatively sought to induce the Nisenzons to take no action on their claims against Sadowski for several months by dangling before them the prospect that Sadowski would repay 80 percent of his debts by October 1989 and would then begin to make good on his promise to repay the Nisenzons in full. The Superior Court justice found this communication to be misleading at best because of its failure to disclose Levitt's ownership of the property, a fact that, had it been disclosed, would have alerted the Nisenzons that their presumed security for any eventual repayment from Sadowski was nonexistent. The Nisenzons relied to their detriment on the misrepresentations made by Levitt's law firm, as is evidenced by the letter from DeVito to Levitt's firm in response to the May 1 letter from Barry: "It was some assurance to my clients to have Mr. Sadowski acknowledge the debt. My clients are willing to delay payment on the debt until October, as you requested * * *." One and one half months after the Nisenzons allowed Sadowski until October to begin repayment of their debt, Levitt then transferred the property again to his partnership, Park City, and granted a mortgage on the land for $150,000 to another lender. By April 1990 the property had been further mortgaged by defendants to a total amount of $315,000. DeVito testified at trial that if he had been aware of the true state of the title in March or April 1989, he would have recommended an immediate at-

1984); *McGovern v. Crossley,* 477 A.2d 101, 103 (R.I.1984); *Halpert v. Rosenthal,* 107 R.I. 406, 412, 267 A.2d 730, 733 (1970); *Cliftex Clothing Co. v. DiSanto,* 88 R.I. 338, 344, 148 A.2d 273, 275–76 (1959). These elements "need only be proven by a fair preponderance of the evidence." *Ostalkiewicz v. Guardian Alarm, Division of Colbert's Security Services, Inc.,* 520 A.2d 563, 569 (R.I.1987). "The general rule is that a misrepresentation should take the form of an expression of fact and not the offering of an opinion or estimate." *St. Paul Fire & Marine Insurance Co. v. Russo Brothers, Inc.,* 641 A.2d 1297, 1299 n. 2 (R.I.1994). "A misrepresentation occurs when there is a 'manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts.'" *Dudzik v. Leesona Corp.,* 473 A.2d 762, 766 (R.I.1984). "A misrepresentation becomes material when it is likely to affect the conduct of a reasonable person with reference to a transaction with another person." *Id.* at 766–67. Finally, "circumstantial evidence may be considered on the question of fraud, and reasonable inferences may be drawn therefrom as long as they are not based on mere suspicion or conjecture." *Fricke v. Fricke,* 491 A.2d 990, 994 (R.I.1985).

12. *See, e.g., L & H Airco Inc. v. Rapistan Corp.,* 446 N.W.2d 372, 380 (Minn.1989). Thus "[a]n attorney has no general duty to the opposing party, but he is liable for injuries to third parties when his conduct is fraudulent or malicious. He is not liable for breach of a duty to the third party, but he is liable for fraud." *Likover v. Sunflower Terrace II, Ltd.,* 696 S.W.2d 468, 472 (Tex.Ct.App.1985). "[A]n attorney is liable if he knowingly commits a fraudulent act that injures a third person or if he knowingly enters into a conspiracy to defraud a third person." *Id.*

tachment or filing of a notice of lis pendens on the property, thereby preventing subsequent transferees of the property from acquiring any interest therein without knowledge of the Nisenzons' claim.

█ In our judgment the trial court properly concluded that Levitt was liable to the Nisenzons for common-law fraud. Levitt not only represented Sadowski, but as the property's owner when he and his law firm were trying to persuade the Nisenzons to forbear from initiating more vigorous debt-collection efforts, he himself had an interest in the subject of his representation. The Nisenzons contacted Levitt through their attorney and verifiably claimed to have an interest in the property. Although Levitt delegated to Barry, an associate in his law firm, the task of responding to the Nisenzons' lawyer and persuading them to forbear from further debt-collection efforts, he cannot escape fraud liability merely because he did not personally sign his firm's May 1, 1989 letter. As an associate in Levitt's firm, Barry was acting not only as Sadowski's attorney when he wrote the May 1 letter to DeVito, but also as Levitt's agent. Thus Levitt is responsible as a principal for allowing Barry as his representative to mislead the Nisenzons for the purpose of inducing them to forbear from initiating more vigorous debt-collection efforts against Sadowski and the property. Instead of disclosing Levitt's own interest in the property, Levitt and his firm made representations concerning Sadowski's present intention to repay the moneys he owed to the Nisenzons and requested a several months' grace period from them, all the while knowing that Levitt owned the property and that the requested forbearance would give Levitt further time to transfer it yet again and encumber it with third-party mortgages. After Levitt and his firm succeeded in persuading the Nisenzons to delay their debt-collection efforts while keeping them in

the dark about Levitt's ownership of the property, Levitt then transferred the property to his own partnership, Park City, and granted mortgages to bona fide mortgagees in excess of what he considered the property's market value to be. Given these facts, we cannot say that the trial justice was clearly wrong in finding common-law fraud against Levitt.

### D. Expanding the Judgment to Include the Unnamed Park City Partners in Their Individual Capacities

█ Although the propriety of entering a judgment against the unnamed Park City partners was considered by the trial justice *before* the judgment in fact entered,[13] we consider the denial of Levitt and Park City's prejudgment request to exclude the unnamed Park City partners from the judgment to be the procedural equivalent of a denial of a postjudgment motion to vacate pursuant to Super.R.Civ.P. 60(b)(4).[14] We exercise a de novo standard of review because such a motion "which contends that a judgment is void is one which is *not* addressed to the court's discretion. A judgment is either valid or it is not and discretion plays no part in resolving the issue." *Shannon v. Norman Block, Inc.,* 106 R.I. 124, 130, 256 A.2d 214, 218 (1969). "If the judgment is void, the movant has an unqualified right to relief." *Id.* at 132, 256 A.2d at 219.

The form of judgment here is ambiguous in that it refers to defendants merely as "Arthur Sadowski et als" rather than name each defendant that is included in the judgment and specify the capacity for which each has been found liable. However, at the March 25, 1994 hearing Levitt and Park City objected to the form of the Nisenzons' proposed judgment and asked the court to exclude the unnamed Park City partners from the judgment because of a lack of personal

---

**13.** The issue of the court's personal jurisdiction over the unnamed Park City partners was raised by Levitt and Park City. However, pursuant to *Lamarche v. Lamarche,* 115 R.I. 472, 475, 348 A.2d 22, 23 (1975), "[i]t matters not how, or in what way, or at what time the objection to [the entry of a void judgment] * * * is brought to the court's attention." The Superior Court is duty bound to "remove the cloud" of a void judgment

"on its own motion whenever it is brought to its attention. * * * Since [the judgment] * * * *is* void, it has no efficacy at any time." *Id.; see also May v. Penn T.V.,* 686 A.2d 95, 99 (R.I.1996).

**14.** *See also* G.L.1956 § 9–21–2(4) (allowing courts to relieve a party or his legal representative from a final judgment that is void).

jurisdiction over them. This proposed judgment provided it would enter "as against Defendant JAMES D. LEVITT, both in his individual capacity and as a general partner in Defendant PARK CITY CAPITAL, and as against Defendant PARK CITY CAPITAL and its general partners, to wit James D. Levitt, Leo J. Gannon, John G. Ridlon, and Fred S. Hashway, Jr., and Stephen A. Gordon. All said Defendants are jointly and severally liable for said judgment." Because the trial justice overruled Levitt and Park City's objection and refused to accept their lack-of-personal jurisdiction argument, we read the "et als" in the judgment that entered as including the unnamed Park City partners.[15]

As noted above, the unserved and unnamed Park City partners argue that the judgment entered against them is void because they were neither named as defendants nor served with process and that thus the Superior Court had no personal jurisdiction over them. They argue further that the entry of judgment against them in an individual capacity violates Rhode Island partnership law. The Nisenzons argue in opposition that notice to a partner is notice to the partnership, G.L.1956 § 7–12–23, that a partnership is liable for the wrongful acts of its partners, § 7–12–24, and that all partners are jointly and severally liable for everything chargeable to the partnership, § 7–12–26. Accordingly the Nisenzons argue that service of process upon Levitt in his capacity as a general partner of Park City constituted notice to the partnership and that Levitt was found guilty of wrongful acts attributable to the partnership; therefore, the entry of judgment against each partner individually was

proper. Lacking in their calculus, however, is any reference to the due-process rights of the unnamed Park City partners. To the extent the judgment purports to bind the unnamed Park City partners in their individual capacities without their having been afforded notice and an opportunity to be heard, it is void as violative of their due process rights. *See* U.S. Const. Amend. XIV, sec. 1 ("[n]o state shall * * * deprive any person of * * * property, without due process of law"); R.I. Const. art. 1, sec. 2 ("[n]o person shall be deprived of * * * property without due process of law"); *Fricke v. Fricke*, 491 A.2d 990, 997 (R.I.1985) ("[i]t is fundamental that the Fourteenth Amendment requires notice and an opportunity to be heard before one is deprived of his property or liberty"). Moreover, to the extent the Uniform Partnership Act of 1914 as enacted in Rhode Island (§§ 7–12–12 to 7–12–55) even addresses the issue,[16] the Nisenzons' argument fails as a matter of partnership law as well.

▇▇ Pursuant to the rules relating to service of process,[17] "[a] party to a judgment is one who is named as such in the record and is properly served with process or enters an appearance." *State v. Manco*, 425 A.2d 519, 521 (R.I.1981). An appearance is "[a] coming into court *as party* to a suit, either in person or by attorney, whether as plaintiff or defendant." Black's Law Dictionary 97 (6th ed. 1990). (Emphasis added.) Two critical components of a valid judgment are that "the court have jurisdiction of the subject matter and of the parties whose rights are to be adjudicated. A valid judgment cannot be entered against an individual who has not

---

**15.** *Compare Blanchard v. Blanchard*, 484 A.2d 904, 906 (R.I.1984) ("[w]hen the meaning of the decree is clear and unambiguous, reference cannot be made to material beyond the decree") *with Pate v. Martin*, 13 Ark.App. 182, 681 S.W.2d 410, 412 (Ark.Ct.App.1985) ("[i]t has long been the rule that in construing a judgment where the identity of a person against whom judgment is rendered is ambiguous or uncertain, resort may be had to the entire judgment or opinion for purposes of identification"); *see generally* 46 Am. Jur.2d *Judgments* § 97 (1994) ("a judgment which is ambiguous and uncertain may be read in connection with the entire record and construed accordingly").

**16.** *Compare* Uniform Partnership Act (1914) § 15 cmt, 6 U.L.A. 456 (1995) ("this act is one to make uniform the substantive law of partnership") *with* Uniform Partnership Act (1994) § 307(c) & cmt 1, 6 U.L.A. 47 (1995) ("[s]ection 307 [specifying that judgment against partnership is not judgment against a partner] is new").

**17.** *See, e.g.,* Super.R.Civ.P. 4(a) ("[t]he summons shall * * * identify * * * the parties, [and] be directed to the defendant"); Super.R.Civ.P. 4(e) (absent waiver, "[t]he summons and complaint shall be served together" and "[s]ervice shall be made" as detailed in the Superior Court Rules of Civil Procedure).

received any notice which would have afforded an opportunity for the concerned individual to show cause against its entry." *Lamarche v. Lamarche*, 115 R.I. 472, 474, 348 A.2d 22, 23 (1975). Moreover, "rules relating to service of process are to be followed and construed strictly since [absent waiver] jurisdiction of the court over the person of a defendant is dependent upon proper service having been made." *Shannon*, 106 R.I. at 130, 256 A.2d at 218. In addition, "the mere fact that a defendant has knowledge of a suit pending against him is insufficient to give a court jurisdiction, absent service of process or a voluntary appearance * * *." 62B Am. Jur.2d *Process* § 5 (1990). Because the unnamed Park City partners were not named as parties, were not served with process, and did not waive service of the summons and complaint, they cannot be parties to the judgment, and any judgment entered against them in an individual capacity is void.

██ Thus, after reviewing Rhode Island's enactment of the Uniform Partnership Act of 1914 and the cases decided under it, we reject the Nisenzons' argument that Rhode Island's partnership law authorizes the entry of a personal judgment against an unnamed and unserved partner in an action against a partnership.

██ Rule 17(b) of the Superior Court Rules of Civil Procedure provides that "[t]he capacity of * * * a partnership * * * [to] be sued shall be determined by the law of this state." Rhode Island law has long held that,

without joining at least one partner to the action, "[a] partnership has no capacity to * * * be sued as such. Actions must be maintained by and against the partners." 1 Kent, *R.I. Civ. Prac.* § 17.5 at 168 (1969).[18] However, when, as here, the liability of the partners for the wrongful acts of a partner acting within the ordinary course of partnership business is alleged to be joint and several, *see* § 7–12–26(a) ("[a]ll partners are liable * * * [j]ointly and severally for everything chargeable to the partnership"), there is no requirement that all partners be sued to bring the claim against the partnership before the court.[19]

██ Rather, because partnership liability is joint and several, the Nisenzons had the option of selecting which partners they wished to serve to bring Park City within the jurisdiction of the court, as long as they served at least one partner in his or her capacity as partner. *See* §§ 7–12–23, 7–12–24; *see also Louis Benito Advertising, Inc. v. Brown*, 517 So.2d 775, 776 (Fla.Dist.Ct.App.1988) ("[s]ervice of process on one partner gives a court jurisdiction over the partnership and authorizes it to render a judgment binding on the partner served and the partnership property"). Although this court's reasoning in *Nathanson v. Spitz*, 19 R.I. 70, 31 A. 690 (1895), suggests that a judgment could *not* properly enter against an unserved partner, the question of whether service on one partner is sufficient to subject the unserved partners' *personal* property to

18. *See also* Rhode Island Annotations to the Restatement of the Law of *Judgments* § 24 (1957) ("[n]o case or statute found allowing suit against a partnership or unincorporated association in the firm or common name"). *But see* Unif. Partnership Act (1994) § 307(a), 6 U.L.A. 46 (1995) (not adopted in Rhode Island) ("[a] partnership may sue and be sued in the name of the partnership"); *cf. Billings & Co. v. Pine Street Realty Associates Limited Partnership*, 754 F.Supp. 10, 13 (D.R.I.1990) ("limited partnerships can * * * be sued as separate entities" in Rhode Island).

19. The Nisenzons argue further that requiring a plaintiff to serve every member of a partnership is too onerous and contravenes Rule 1 of the Superior Court Rules of Civil Procedure in that a plaintiff may not know all the members of a partnership. First, as noted above, when liability is joint and several, there is no such requirement to serve every partner. Second, the rules

of civil procedure cannot be construed to compromise the paramount interests of due process. Even though it certainly would be faster and less expensive for a plaintiff to bring within the court's jurisdiction all partners' personal property by the relatively simple expedient of serving just one of them, the ultimate objective of due process would be compromised if this were possible. Moreover, if a plaintiff desired to sue each partner so that each partner's personal property would be available to satisfy any judgment, the liberal joinder rules of modern civil procedure can be used to add such parties when information is later acquired through discovery to identify and locate them. Also, if the partners are numerous, a defendant class action could be brought by suing and certifying one partner as the representative of the class of all defendant partners. *See* Super.R.Civ.P. 23.

the court's jurisdiction has not yet been squarely addressed in Rhode Island. However, other jurisdictions, when faced with this question, have ruled that a partner cannot be held personally liable unless he or she has been duly served with process.[20] We agree.

█ In a suit involving served and unserved partners, the trial justice has "carefully to distinguish between *liabilities* of a partnership and the obligation of an unserved general partner to respond personally for such liabilities." *Detrio v. United States,* 264 F.2d 658, 661 (5th Cir.1959). Here, the trial justice stated that "this is a partnership and * * * [the] Handbook of the Law[s] of Corporations and Other Business Enterprises by Harry G. Henn * * * set[s] forth that the general partners are jointly and severally liable for the damages caused by any tort or breach of trust committed by a partner within the scope of partnership business." Accordingly, the trial justice appears to have imposed personal liability upon the unnamed Park City partners. We believe that he erred in doing so because

> "notwithstanding that every partner may be potentially liable for the torts of their partners, in order to impose personal liability on a vicariously liable partner, that partner must be individually named and served in the action * * *. The mere fact that personal liability may exist is only half of the equation. Personal jurisdiction

must be obtained over each of the potentially liable partners for their potential liability to be realized." *Somer & Wand, P.C. v. Rotondi,* 219 A.D.2d 340, 642 N.Y.S.2d 937, 939 (N.Y.App.Div.1996).

*See generally* Uniform Partnership Act (1994) § 307(c), 6 U.L.A. 47 (1995) (not adopted in Rhode Island) ("A judgment against a partnership is not by itself a judgment against a partner. A judgment against a partnership may not be satisfied from a partner's assets unless there is also a judgment against the partner."). Thus we vacate whatever portion of the judgment below that included the unnamed Park City partners in their individual capacities.

## IV

### Conclusion

The appeal of Levitt and Park City is denied and dismissed, and the judgment of the Superior Court is affirmed as it applies to them. The appeal of the unnamed Park City partners is denied and dismissed in part and sustained in part as follows: to the extent the judgment binds their partnership property as a result of the judgment entered against Park City, their appeal is denied and dismissed;[21] but to the extent the judgment purports to bind them in an individual capacity, that portion of the judgment is vacated. Finally the judgment entered against Sadow-

20. *See, e.g., Lava Shadows, Ltd. v. Johnson,* 121 N.M. 575, 915 P.2d 331 (App.), *cert. denied,* 121 N.M. 644, 916 P.2d 844 (1996); *Somer & Wand, P.C. v. Rotondi,* 219 A.D.2d 340, 642 N.Y.S.2d 937 (N.Y.App.Div.1996); *Foster Lumber Co. v. Glad,* 303 N.W.2d 815, 816 (S.D.1981) (holding that "in an action against a partnership, a judgment cannot be rendered against an individual partner unless that partner has been served with process"); *Sarne v. Fiesta Motel,* 79 F.R.D. 567, 570 (E.D.Pa.1978) ("[s]ervice of process on one partner may be sufficient to bind the assets of the partnership, but will not be sufficient to permit the obtaining of a personal judgment against another partner in his individual capacity"); *see generally* 2 Alan R. Bromberg & Larry E. Ribstein, *Bromberg and Ribstein on Partnership,* § 5.11(b) at 5:84–5:85 (1996) ("The judgment in joint and several liability is against the partners sued and served. It ,may be enforced against their individual property, and if the partnership is properly sued and served, the judgment is also enforceable against partnership property. It may not be enforced against a partner who is not

sued and served; service on one partner is not service on other partners."). Because Rhode Island's partnership laws, §§ 7–12–12 to 7–12–55, state that they "shall be so interpreted and construed as to effect their general purpose to make uniform the law of those states which enact them," § 7–12–15(4), we agree with these interpretations.

21. *See* Restatement (Second) *Judgments* § 60(1)(b)(ii) (1982):

> "A judgment in an action by an injured person against a partner upon an obligation or liability incurred in the course of partnership business * * * renders the property of the partnership subject to execution to satisfy the judgment but is not otherwise binding on a partner who was not a party to the action unless he controlled or participated in controlling the defense of the action, or was given notice of an opportunity to defend the action * * *."

ski is vacated because of the bankruptcy stay and the Superior Court's pretrial order staying this action against him. This case is remanded to the Superior Court for entry of an amended judgment in conformity with our opinion.